UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

STEVEN D. PILLOW,

      Plaintiff,

  v.                                       Case No. 14-C-1298

CITY OF APPLETON,
CASEY VOSS,
GARY LEWIS, and
DR. DENNIS LAUNDRIE,

      Defendants.

---

## DECISION AND ORDER GRANTING DR. DENNIS LAUNDRIE'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Steven Pillow sued the City of Appleton, Casey Voss, and Gary Lewis under 42 U.S.C. § 1983 for allegedly violating his constitutional rights. He has also raised a state law battery claim against Dr. Laundrie who performed a forced catheterization. Arising under federal law, Pillow's § 1983 claim provides this court with jurisdiction under 28 U.S.C. § 1331. The court also has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367. Before the court is Dr. Laundrie's motion for summary judgment. For the following reasons, Dr. Laundrie's motion will be granted.

### BACKGROUND

The following facts are taken from Dr. Laundrie's proposed findings of fact. (Def.'s Proposed Findings of Fact (DPFOF), ECF No. 49.) Because Pillow did not dispute Dr. Laundrie's proposed findings, the court deems them admitted. *See* Civil L.R. 56(b)(4) ("The Court will deem

uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment.").

At approximately 9:00 p.m. on July 23, 2013, Pillow overdosed on heroin at a bus stop, resulting in a seizure and loss of consciousness. (DPFOF ¶¶ 1–3.) Paramedics and law enforcement were called to the scene. Pillow was reported to be a "pulseless non-breather," and the paramedics noted he continued to have difficulty breathing when they arrived. Pillow was ultimately taken to the St. Elizabeth Hospital Emergency Department for further treatment. The Appleton Police Department accompanied Pillow to the emergency department to obtain medical clearance to take him into custody. (*Id.* ¶ 12.)

Pillow was "quite disoriented" when he arrived at the hospital and went in and out of consciousness throughout his stay. (*Id.* ¶ 14.) He was attached to a cardiac monitor, received oxygen, and remained handcuffed to his bed under police custody. The triage assessment revealed Pillow was drowsy and had pain in his face. Pillow indicated he was a current every day smoker and a current user of alcohol, street drugs, heroin, and IV drugs. (*Id.* ¶ 16.)

Dr. Laundrie, the physician in the emergency department that evening, noted Pillow had a history of seizure, a possible injury to his head, and a possible intake of "bad heroin." (*Id.* ¶ 13.) During a neurological examination, Dr. Laundrie observed Pillow had a slow response time and continued to be drowsy, confused, or in an altered state of mind. (*Id.* ¶¶ 22, 34.) After the examination, Dr. Laundrie believed it was medically necessary to obtain blood and urine samples to determine the origin of Pillow's mental state and seizure and to evaluate whether his current condition could cause a life-threatening adverse reaction. (*Id.* ¶ 24.) Dr. Laundrie was concerned

2

Pillow would "crash" while in police custody which would result in another seizure or other serious medical complications. (*Id.* ¶ 27.)

Although Pillow was compliant with the blood sample, he was unable to provide a urine sample. (*Id.* ¶ 29.) Dr. Laundrie instructed staff to continue observing Pillow to give him the opportunity to produce a urine sample organically. Pillow's altered mental state and grogginess continued for three hours. Dr. Laundrie concluded there was an emergent need to identify the substances in Pillow's system and to evaluate their effects, which could only be accomplished through urine testing. As a result of Pillow's inability to provide a urine sample after the three-hour period, Dr. Laundrie ordered a straight catheterization. Dr. Laundrie explained the procedure to Pillow prior to administering the catheter, though Pillow did not have the capacity to consent to it. Pillow did not struggle or fight the procedure, which involved placing a catheter in Pillow's urethra to drain the urine directly from his bladder. (*Id.* ¶ 35.) Pillow's urine sample tested positive for cocaine, methamphetamine, marijuana, and opiates. Medical staff continued monitoring Pillow's condition. Dr. Laundrie gave medical clearance to Pillow at 2:30 a.m. after he concluded Pillow no longer had emergent medical conditions that would preclude Pillow's discharge from the hospital and his entrance into a behavioral health unit, crisis facility, or jail. Nevertheless, Dr. Laundrie's discharge instructions ordered that Pillow be monitored with frequent checks about every fifteen minutes for the first one to two hours after leaving the hospital.

On the basis of these facts, Pillow commenced this action against the City of Appleton and Officers Voss and Lewis. He asserted claims under § 1983, alleging that the officers used excessive force when they tackled him at the bus stop and violated his rights by participating in the forced catheterization. On May 4, 2016, Pillow filed an amended complaint adding claims for battery and

3

medical malpractice against Dr. Laundrie and the health care facility where the catheterization occurred. The court dismissed Pillow's medical malpractice claim against these defendants on July 15, 2016. Dr. Laundrie has now moved for summary judgment on the battery claim.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Pillow claims Dr. Laundrie committed battery when he administered a catheter against Pillow's will. To prevail on a civil battery claim, a plaintiff must demonstrate that the defendant intentionally caused bodily harm to the plaintiff without his consent. Wis. JI–Civil 2005. Bodily harm includes "physical pain or injury, illness, or any impairment of physical condition." *Id.* A plaintiff may establish that the defendant intentionally caused bodily harm by demonstrating that the defendant had the mental purpose to cause bodily harm or was aware that his conduct was practically

4

certain to cause it. *Id.*; *see also Vandervelden v. Victoria*, 177 Wis. 2d 243, 249, 502 N.W.2d 276 (1993); *Insolia v. Phillip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000). Dr. Laundrie argues Pillow is unable to establish the elements of battery. Alternatively, he argues that even if Pillow can demonstrate that Dr. Laundrie's actions constituted civil battery, his conduct was justified under the medical emergency exception.

Viewing the evidence in the light most favorable to the nonmoving party, the record demonstrates that Dr. Laundrie committed civil battery against Pillow when he administered the catheter without his permission. Both the United States Supreme Court and the Wisconsin Supreme Court have recognized an individual's right to refuse unwanted medical care. *See Cruzan v. Mo. Dept. of Health*, 497 U.S. 261, 304–05 (1990) (acknowledging that "a competent person has a constitutional right to avoid unwanted medical care"); *Trogun v. Fruchtman*, 58 Wis. 2d 569, 596, 207 N.W.2d 297 (1973) (recognizing claims for battery against treating physicians). In this case, the parties do not dispute that Pillow did not voluntarily seek medical treatment from Dr. Laundrie or that he did not consent to the catheterization. Moreover, the evidence shows Dr. Laundrie intentionally caused bodily harm during the procedure. Even if Dr. Laundrie did not act with malice or intend to inflict harm while administering the catheter, he must be aware that the procedure was practically certain to cause physical pain. In short, the court finds that Pillow has made the requisite showing to establish that Dr. Laundrie committed civil battery.

Having determined that Dr. Laundrie's actions constitute civil battery, the court turns to his contention that his conduct is protected by the medical emergency exception. Dr. Laundrie asserts that administering the catheter without Pillow's permission was justified because it was medically necessary and Pillow did not have the capacity to consent to the procedure. Indeed, an individual

5

"who provides emergency medical care to a person who is unconscious, incompetent, or otherwise unable to give consent is not liable for battery or other violation of the patient's rights." *Sullivan v. Bornemann*, No. 00-C-1392, at 7 (E.D. Wis. Apr. 28, 2003), *aff'd*, 384 F.3d 372 (7th Cir. 2004); *see also Restatement (Third) of Torts* § 892D (2012). "[A] true emergency is ordinarily a substitute for the patient's consent where the patient is in fact unable to give or withhold consent." Dan B. Dobbs, et al., *The Law of Torts* § 115 (2d ed. 2016); *see also* Alan Meisal, *The Exceptions to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking*, 1979 Wis. L. Rev. 413, 434 ("As a general rule, in an 'emergency' a doctor may render treatment without the patient's informed consent.").

This is the type of situation to which the emergency exception would apply. During Pillow's stay in the emergency department, he was either sleeping, drowsy, confused, or in an altered state of mind. After conducting a neurological examination and observing Pillow's condition, Dr. Laundrie believed his symptoms were inconsistent with his admitted use of heroin. Dr. Laundrie sought to obtain blood and urine samples to determine the cause of Pillow's seizures, altered mental state, and breathing problems so that he could provide proper treatment. Although Pillow complied with a blood draw, he was unable to provide a urine sample. Dr. Laundrie gave Pillow some time to organically produce a sample. After three hours, however, Pillow still had not provided a urine sample. His mental and physical condition had not improved, and Dr. Laundrie concluded there was an emergent need to extract urine to detect whether certain toxins or substances in Pillow's system could cause life-threatening adverse reactions, including cardiac arrest, respiratory depression, or death. This could only be accomplished through urine testing.

Prior to administering the catheter, Dr. Laundrie explained the procedure to Pillow, though Pillow remained in a drowsy, confused, or altered state of mind. The record demonstrates that Pillow did not have the capacity to consent to the procedure. During the placement of the catheter in Pillow's urethra, he did not struggle or fight. Pillow's urine sample ultimately tested positive for cocaine, methamphetamine, marijuana, and opiates. Based on the results of the testing, Dr. Laundrie found Pillow's condition required additional observation. He gave medical clearance at 2:30 a.m. and instructed the jail to check on Pillow every fifteen minutes for the first one to two hours after his discharge from the hospital.

Dr. Laundrie asserts he only administered the catheter to provide medically necessary care to Pillow. Although Dr. Laundrie administered the catheter more than three hours after Pillow was first admitted into the emergency department, he asserts it was an emergent and medically necessary procedure because Pillow's condition had not changed. Pillow does not dispute that he was unable to consent to or decline the catheterization. He also does not dispute that there was an emergent need to test his urine to identify the substances in his system or that this could only be accomplished through urine testing. Accordingly, Dr. Laundrie's administration of the catheter was justified under the medical emergency exception. Pillow's battery claim against Dr. Laundrie must therefore be dismissed.

## CONCLUSION

Based upon the foregoing analysis, Dr. Laundrie's motion for summary judgment (ECF No. 47) is **GRANTED**. Dr. Laundrie is dismissed as a party to this action. What remains to be resolved is Pillow's 42 U.S.C. § 1983 claim against the City of Appleton, Casey Voss, and Gary Lewis. A

7

final pretrial conference will be held on **Friday, July 14, 2017 at 3:00 p.m.**  The trial will begin **Monday, July 31, 2017 at 8:30 a.m.**

    **SO ORDERED** this  1st  day of June, 2017.

                                              s/ William C. Griesbach
                                              William C. Griesbach, Chief Judge
                                              United States District Court